*936 OPINION OF THE COURT
Geoffrey O’Connell, J.
Defendant, George P. Briggs, was tried by this court without a jury upon an information accusing him of violating Navigation Law § 49 (4) (a) (2), which prohibits boating while intoxicated. Because the case posed a number of novel questions under a relatively new statute, a written decision is appropriate.
The information alleges that the defendant boated while intoxicated at 6:30 a.m. on September 24, 1989 in the waters off Centre Island in the Town of Oyster Bay and County of Nassau.
FACTUAL BACKGROUND
At 11:00 a.m. on the day preceding that upon which the offense charged allegedly occurred, Captain Robert Arata was operating his commercial towing vessel in Northport Bay off the Village of Ashroken in Suffolk County. He observed a 40-foot "mainship” with fore and aft cabins and a flying bridge aground but refloatable. Its engines were running. When the skipper of the stranded vessel made no request for assistance, Captain Arata went about his business.
Shortly thereafter, Chief Brooks of the Ashroken Police Department responded to a report of a large vessel aground off the Ashroken beach. Arriving at the location, Chief Brooks observed a large cabin vessel named Colleen II beached. He walked out to the vessel and boarded it with permission. He observed the defendant with a beverage in his hand and nearby a counter area with 4 or 5 liquor bottles at least one of which was empty and others of which were partially filled. The defendant said that he was drinking vodka.
Chief Brooks suggested to the defendant that he deploy the vessel’s anchors so that when the tide flowed back the vessel would not be washed further ashore. He told the defendant that he would radio his marine unit to assist the defendant in deploying the anchors. Within 10 to 20 minutes of boarding the vessel he returned to his police vehicle and left.
At about 3:00 p.m. Captain Arata returned to the vessel in response to a request for a tow. It was the Colleen II. The vessel was no longer beached, but was aground and had floated over the bow anchor. The defendant was attempting to untie the stern anchor and, upon succeeding, was not able to *937 hold the anchor line and the anchor was lost. The bow anchor was operated by an electric windlass. Captain Arata and his crew freed the propeller from the bow anchor line. Upon boarding the vessel to secure payment, Captain Arata observed the defendant fill half a glass with vodka, add some orange juice and drink from it. The anchor was weighed mechanically and the defendant departed with engines running.
A Coast Guard radio log admitted into evidence as defendant’s exhibit E reveals a call at 11:00 p.m. on September 23, 1989, from the Greenwich, Connecticut police relaying a report from the Colleen II that a boat was on fire in the area of Flat Neck Point. A chart admitted into evidence as defendant’s exhibit D shows Flat Neck Point as being within Connecticut waters. Testimony from Nassau County Marine Police Officer Gerard Sampson revealed that during the night in question there was a steady wind of from 10 to 15 miles per hour out of the north. Seaman Jeff Bowman who has four years’ experience with the Coast Guard testified that given that wind velocity and direction a vessel could drift from Flat Neck Point to Rocky Point in a period from 3 to 4 hours.
The next contact with the Colleen II, according to the radio log, was a request at 2:03 a.m. on September 24,1989, that she fire up a red flare. The flare was spotted in the vicinity of Oak Neck Point on Nassau County’s north shore. At 2:37 a.m., the Coast Guard caught sight of the Colleen II on the Centre Island reef off Rocky Point. The rocks prevented the Coast Guard from reaching the Colleen II so they radioed for assistance from Nassau County Police Marine Unit 3 which was, at the time, moored in Oyster Bay Harbor south of Centre Island.
Officers Sampson and Groblewski got their vessel under way and headed out of Oyster Bay Harbor around Centre Island. As they left the harbor they observed the Coast Guard vessel and concluded that if it were unable to reach the Colleen II, they would be no more successful. They arranged to have the Centre Island police meet them and drive them to Rocky Point which happened to be near the Centre Island police booth. They then proceeded on foot, jumped down from a seawall onto a narrow beach and observed the Colleen II some 100 feet distant from the high water mark on the seawall. The winds were from the north and the tide was coming in. The vessel fired a flare. There was no sound of engines.
*938 The evening was dark with three-foot seas and the wind pushed the Colleen II on the rocks as the tide receded. Its bow faced north with the stern closest to the shore. The police illuminated the vessel with a portable spot light. Police Officer Sampson yelled to a male later determined to be the defendant. Because of the strong wind Officer Sampson found it difficult to communicate, but did learn that there were no injuries.
Shortly before 4:00 a.m. Officer Groblewski returned to the marine unit at the Sewanaka Yacht Club to get two survival suits, waterproof garments used for protection in the water. Once back at the seawall he donned the survival suit and walked out to the Colleen II. When he reached the vessel the water was up to his chest. Boarding over the stern swim platform, he encountered the defendant. From the afterdeck he could see the flashing blue light of the Coast Guard vessel standing off a quarter mile east. He told the defendant that his anchor was not deployed, but was hanging off the bow barely touching the water. Officer Groblewski asked if he could put it in the water. The defendant responded that he should leave the "_” thing alone, it was "fine”.
Officer Groblewski followed the defendant into the cabin where the defendant appeared to be looking for flares for his flare gun. He had periodically been firing flares from the deck. Officer Groblewski detected a strong odor of alcohol and observed that the defendant was having great difficulty loading the flare gun. He noticed bottles in the galley including at least one of vodka. Fearing for his own safety, Officer Groblewski took the flare gun and hid it. Then he told the defendant he would go back for another survival suit. The defendant responded that he was not leaving the vessel and that he wanted the Coast Guard.
As Officer Groblewski returned to the shore, the defendant returned to the aft deck, flare gun in hand. Officer Sampson observed him unsteadily waving the flare gun around attempting to fire it. He and Officer Groblewski ducked behind the seawall for safety. The defendant eventually successfully fired a flare into the air.
Officer Groblewski started to wade out to the vessel for a second time. The boat was now about 75 feet from the seawall and Officer Sampson yelled to the defendant attempting to persuade him to come ashore. The defendant climbed up to the flying bridge. As he approached the controls, Officer *939 Sampson shouted that he should stay away from them. Instead he manipulated the throttle and clutches and said, "I’m getting out of here.” Officer Groblewski wading in the water heard Officer Sampson shouting, "Watch out! He’s starting the engines.” He then heard the engines turn over, but not catch. He scrambled for the shore to avoid the propellers. The two officers determined to await full high tide and the vessel’s inevitable arrival at the seawall.
By 6:00 a.m., the vessel was at the seawall. Police Officer Frichette had responded to the scene and he and the other two officers assisted the defendant in removing certain property from the vessel. The defendant disembarked and was escorted to the Centre Island police booth. There Officer Frichette observed that the defendant was unsteady on his feet. His eyes were bloodshot and his speech slurred. The officer detected the odor of alcohol on his breath. Officer Sampson made similar observations. Upon asking the defendant for identification, he fumbled with the contents of his wallet. At 6:30 A.M., Office Sampson told Mr. Briggs he was under arrest for boating while intoxicated.
The police transported the defendant to the central testing section at police headquarters in Mineóla. Once there Police Officer Sampson read him the form 37 advisement with respect to breath and blood tests and the defendant consented to a breath test. At 8:30 a.m. the defendant announced that the two-hour time period for a breath test had expired, but breathalyzer technician Johnson informed him that there was no two-hour limitation in boating while intoxicated cases. The two breathalyzer tests administered at about 8:45 a.m. produced readings of .17 of 1% blood alcohol content. Officer Johnson also administered certain performance tests and concluded that the defendant was intoxicated based upon his lack of balance and coordination, his slurred speech, bloodshot eyes and the odor of alcohol on his breath.
CONCLUSIONS OF LAW
In 1986, increased public awareness of the dangers of alcohol led the Legislature to address the problem of boating by persons under the influence of alcohol. However, in adapting the Vehicle and Traffic Law provisions to a new context, some changes were unavoidable.
Vehicle and Traffic Law § 1194 (1) (now § 1194 [2]) was not incorporated into the Navigation Law. Accordingly, opera *940 tion of a vessel is not deemed to be a consent to a chemical test of the blood, breath, urine or saliva. Rather Navigation Law §49 (4) (d) (1) provides that no person who operates a vessel may refuse to submit to a court-ordered chemical test. The provisions of Vehicle and Traffic Law § 1194 (3) dealing with court-ordered chemical tests were modified and incorporated as Navigation Law §49 (4) (d) (2) et seq. Vehicle and Traffic Law § 1194 (3) has been held to not include any two-hour limitation. (People v McGrath, 135 AD2d 60, 62.) While Vehicle and Traffic Law § 1194 (1) (now § 1194 [2]) appears to envision the refusal to voluntarily submit to a test requested within two hours by its reference to subdivision (2) of the same statute, there is no parallel reference in the Navigation Law and, as noted already, Vehicle and Traffic Law § 1194 (2) is not included among the borrowed provisions. Accordingly, there is no basis for excluding the results of the breathalyzer tests because they were administered more than two hours after the defendant’s arrest.
The more significant issue posed on these facts is whether the term "operation” is to be construed according to the case law developed under the Vehicle and Traffic Law or redefined to fit the new context. There is a clear parallel between Navigation Law §49 (4) (a) (2)’s proscription: "No person shall operate a vessel * * * while * * * in an intoxicated condition”, and Vehicle and Traffic Law § 1192 (3)’s "No person shall operate a motor vehicle while in an intoxicated condition.” The prosecution has argued for a distinction based upon the differing definitions of "vessel” and "motor vehicle”. Navigation Law § 2 (6) defines "vessel” to mean, "any floating craft”. It also defines "under way” as meaning, "the vessel is not at anchor, or made fast to the shore, or aground.” (Navigation Law §2 [16].) The People contend that the failure to include any reference to mechanical means of propulsion as contained in the definition of "motor vehicle” (Vehicle and Traffic Law § 125), permits the court to conclude that an individual "operated” a vessel even if it were adrift and not possessed of an operable mechanical means of controlling its motion. The problem with this argument is that Navigation Law § 49 does not rely upon the general definition of "vessel” contained in section 2. Rather section 49 (4) (a) (3) defines the term "vessel” to mean a "mechanically propelled vessel.”
Generally, courts have determined the issue of operation in the context of motor vehicles on the condition of the engine. (Gerstenzang, Handling the DWI Case in New York § 23.23.) *941 Evidence that the defendant was behind the wheel with the keys in the ignition and the motor running has been found sufficient "operation” even where the vehicle is not in motion. (People v Marriott, 37 AD2d 868; People v David W., 83 AD2d 690; but see, People v DeSantis, NYLJ, May 21,1990, at 32, col 4 [defendant using engine for heat].) However, at least two courts in non-DWI cases have found "operation” where the vehicle’s engine was disabled. In People v Hakimi-Fard (137 Misc 2d 116), the defendant was steering a disabled vehicle that was being pushed. In People v Chin (96 Misc 2d 627), the defendant was steering a vehicle that was being towed by a nonrigid towing device. Both courts reasoned that the defendant was using the mechanical capabilities of the vehicle to control and direct it even though the forward motion was not being imparted by the vehicle itself.
This court finds the definition of "vessel” contained in Navigation Law §49 (4) (a) (3) sufficiently analogous to the definition of motor vehicle in the Vehicle and Traffic Law to permit reliance upon the case law referred to above. It is not sufficient evidence of "operation” to merely establish that a defendant was in charge of a vessel that was under way. If, as here, there is no evidence that the vessel was capable of navigation by use of its engines, then there must be evidence that he or she could have controlled the vessel through some other mechanical capability of the vessel.
Captain Arata who assisted the Colleen II off Ashroken in Suffolk County testified that he observed the windlass used to deploy the bow anchor which the defendant operated by means of an electric motor preparatory to getting under way. While he was familiar with such a windlass, he could not say with any certainty whether it could be manually operated in the event of a power failure. Police Officer Sampson testified that when he observed the vessel off Rocky Point there was no lighting on the vessel. While Police Officer Groblewski offered to deploy the anchor, he made no observations as to the operability of the mechanism.
In short, there is no evidence that the defendant had any means of controlling the vessel by use of its engines or any other mechanical device aboard the craft. The evidence is consistent with the theory that the vessel drifted in a disabled condition from Flat Neck Point off Connecticut to Rocky Point. While there is evidence that the defendant operated his vessel in an intoxicated condition in Suffolk County waters on *942 September 23, 1989 and perhaps even in Connecticut waters on September 24, 1989, there is no evidence that he had control of or otherwise operated the Colleen II within Nassau County waters.
The court finds the defendant not guilty.